## Case No. 12,322.

### The SAN JOSE INDIANO.

[2 Gall. 268.] [1]

Circuit Court, D. Massachusetts. Oct. Term, 1814. [2]

PRIZE—ENEMY PROPERTY—RESIDENCE OF OWNERS —PARTNERS—PRESUMPTIONS.

1. A ship is deemed to belong to the country, where the owners reside.

2. If a ship carry the Portuguese flag. but the owners reside in England, she is condemnable as prize of war.

3. Courts of prize look to the legal interest in the ship. and will not recognise neutral equitable interests.

4. The property of a person may acquire a hostile character, although his residence be neutral. Therefore, where a person is engaged in the ordinary or extraordinary commerce of an enemy's country, upon the same footing,

[1] [Reported by John Gallison, Esq.]
[2] [Affirmed in 1 Wheat. (14 U. S.) 208.]

and with the same advantages as native resident subjects, his property employed in such trade is deemed incorporated into the general commerce of that country, and subject to confiscation, be his residence where it may.

See Curt. Dig. tit. "National Character."

[Cited in The Sarah Starr, Case No. 12,352.]

5. If there be a house of trade established in the enemy's country, the property of all the partners in the house is condemnable as prize, notwithstanding some of them have a neutral residence. But such connexion will not affect the other separate property of the partners having a neutral residence.

See Story, Partn. § 316, and authorities there cited.

[Cited in The Cheshire, 3 Wall. (70 U. S.) 233.]

6. If such house ship goods, on their own account, to one of the partners, who is domiciled in a neutral country, it is liable as prize; but it is otherwise, if the shipment be made by the order of the partner, on his separate account and risk, and not on joint account.

[Cited in Rogers v. The Amado, Case No. 12,005.]

7. If a person domiciled in the enemy's country be a partner in a house of trade established in a neutral country, and ship goods to them upon their joint account and risk, and not on his separate account, the goods are not liable to condemnation. But it is otherwise, if shipped for his separate account.

8. In general, the residence of a stationed agent in an enemy's country will not affect the trade of the neutral principal with a hostile character. But this is true only, as to the ordinary trade of a neutral, as such, carried on in the ordinary manner; for if such trade is carried on, not on the footing of a foreign merchant, but as a privileged trader, or by an incorporation with the general commerce of the enemy, in the same manner and with the same benefits, as a native merchant, it is deemed hostile.

9. Therefore, if a partner in a neutral house be domiciled in the enemy's country, and engaged in its general commerce, for the benefit of his neutral house, the property is condemnable as prize.

10. The doctrine as to stoppage in transitu applies only to the case of insolvency, and presupposes, not only that the property of the goods has passed to the consignee, but that the possession is in a third person in transit to the consignee. It cannot apply to a case where the actual or constructive possession remains in the shipper, or his exclusive agents.

11. In general, the rules of the prize court, as to the vesting of property, are the same as those at common law.

12. Where a merchant abroad, in pursuance of orders to purchase goods, sells either his own goods, or purchases goods for his correspondent on his own credit, no property in the goods vests in his correspondent, until he has done some notorious act to divest himself of his title, or has parted with the possession by an actual and unconditional delivery for the use of such correspondent.

13. A shipment made by the shipper to his own agent, of the goods so purchased, giving him a right to hold them, until he has made arrangements with his correspondent, does not devest the title or possession of the shipper.

14. Where a shipment is made to a firm, and the persons who compose it do not appear, further proof will be required of the names and domicil of the parties.

15. Where a shipment is made to partners, they are held by the prize court to take in equal moieties, unless upon the original papers a different proportion appears.

16. Where a shipment is made in an enemy's vessel, in a voyage from an enemy's country, it is presumed to belong to enemies, unless a distinct neutral character be impressed upon it. [The San José Indiano] 1 Wheat. [14 U. S.] 208.

17. The treaty of 1810, between the Portuguese and British governments, did not prevent British merchants, resident in the Brazils, from acquiring the neutral character of their domicil.

[18. Cited in The Sarah Starr, Case No. 12,353, to the point that neutrals are entitled to a reasonable time, after the breaking out of the war, in which to withdraw their business connections in the enemy's country.]

[19. Cited in brief in The Revere, Case No. 11,716, and cited in United States v. One Hundred Barrels of Cement, Id. 15,945, and The Cheshire, 3 Wall. (70 U. S.) 233, to the point that intentional misrepresentation of the character and destination of the voyage of the captured vessel is sufficient cause for condemnation of the vessel and cargo.]

[20. Cited in The Cuba, Case No. 3,457, to the point that the claimant must make his claim and affidavit without the assistance of the ship's papers in shaping them; and, if they be found to agree substantially with the documents, he may afterwards be permitted to rectify formal errors from the documents themselves.]

This was a prize cause, coming before this court on appeal from the district court of Maine. The cargo was claimed by the master in behalf of twenty-six different shippers, including a claim for his own adventure; and the ship was claimed by him as the property of Da Costa, Guimaraens and Co. of Liverpool.

At the opening of the cause, Pitman, for the captors, stated, that in the court below the claimant had been permitted to examine the papers before filing the claim, and he produced the record, from which it appeared, that an objection to this course, made by the captors, was overruled by the court.

STORY, Circuit, Justice. This is contrary to the ordinary practice. In general, the claimant must make his claim and affidavit, without being assisted by the papers in shaping them, and if they be found substantially to agree with the documents, he will afterwards be permitted to correct any formal errors from the documents themselves. But in special cases, where a proper ground is laid by affidavits, an order will be made for an examination of such papers, as are necessary to a party to make a proper specification of his own claim, but not for a general examination of all the ship's papers. See The Diana [Case No. 3, 876].

As the several claims, with the facts relating to them, are distinctly considered in the opinion of the court, it will be unnecessary here to detail the circumstances of each shipment. It will be sufficient to observe, that the claimants were either Portuguese or British subjects, residing, some in Brazil, and others in England, and for the most part mem-

bers of commercial houses, having establishments, or resident partners, in both the countries. The cases divided themselves into three classes: (1) Where there were houses in both the countries constituted by the same persons. (2) Where there were houses in both the countries, but the partners not all the same. (3) Where there was no house in the belligerent country, but a partner residing there for the purpose of transacting business.

The questions of law discussed in the argument were, either as to the neutral or hostile character of the property, considered in relation to the residence and commercial connexions of the owner; or they concerned the right of property, whether it remained in the belligerent shipper, or had vested in the neutral claimant, at the time of the capture?

In regard to the first, Pitman for the captors made two points:

1. That where a partner of a house in an enemy's country resides in a neutral country, and there carries on the trade of the house, the character of the traffic will make the property hostile, notwithstanding the personal residence. The Vigilantia, 1 C. Rob. Adm. 14, 15; The Herman, 4 C. Rob. Adm. 230; The Portland, 3 C. Rob. Adm. 41; The Jonge Klassina, 5 C. Rob. Adm. 302; The Dree Gebroeders, 4 C. Rob. Adm. 235; The Anna Catharina, Id. 118.

2. That British subjects, resident in the Portuguese dominions, were considered in England to retain their British character, and were therefore excepted from the general principles of prize law, as to commercial residence.[3]

Upon these grounds, the captors sought condemnation of the whole of the property belonging to British subjects, wherever resident, and of all that belonging to Portuguese subjects who resided in Great Britain.

W. Sullivan, for claimants.

The captors rest their claim of condemnation upon two grounds: (1) That, though residing in a neutral country, the claimants enjoy there such privileges, as can only belong to British subjects. (2) That they are concerned in houses of trade in the enemy's country.

As to the residence, it is contended, that an Englishman resident in a neutral country is neutral. The Indian Chief, 3 C. Rob. Adm. 12; The Emanuel, 1 C. Rob. Adm. 296; M'Connell v. Hector, 3 Bos. & P. 113. Do the circumstances, under which they reside in the Portuguese dominions, prevent the application of the general principle in the present instance? The 10th article of the treaty, which is relied on for this purpose, cannot have this effect. It provides for nothing more, than the establishment of a tribunal, similar to the consular courts, which exist throughout the world. It is a mere commercial concession, for which the British government gives an equivalent by the treaty. The judge is a Portuguese, chosen by the British subjects, but confirmed by the Prince Regent of Portugal. A British subject so situated might commit treason against the Portuguese government. Chit. Law Nat. 41–46; Id. 37.

Does the connexion with a house of trade in England take away the neutral character? The principle of neutrality derived from residence being once established, it follows, that a British subject so resident may carry on trade with his native country. He may ship, and receive returns, and his goods, in going and coming, will be protected from capture. He may do whatever any other neutral may do. If then he may carry on the trade, how is the case varied, if he choose to connect himself with others in the enemy's country? It cannot deprive him of his neutral character. If he and his partner ship their joint property on the ocean, the belligerent may seize and bring it in; he may make prize of the hostile part and restore the neutral. The belligerent therefore suffers nothing. The Franklin, 6 C. Rob. Adm. 127; The Herman, 4 C. Rob. Adm. 228. The cases cited on the other side do not show, that connexion in a house of trade will make the whole property good prize. The Case of Ostermeyer [3 C. Rob. Adm. 41] amounts to no more, than that his adventure began and was to end at Ostend. The principle is, that an association with a house of trade, established in the enemy's country, does not subject neutral property to condemnation, nor take away the neutral character, if the trade be such, as

<hr/>

[3] The Henrick and Maria, 4 C. Rob. Adm. 61; The Flad Oyen, 1 C. Rob. Adm. 142; the treaty of amity, &c. between his B. M. and the P. R. of Portugal, made at Rio, Feb. 19, 1810, art. 10. (The material part of that article is as follows: "His royal highness, the Prince Regent of Portugal, desiring to protect and facilitate the commerce of the subjects of Great Britain within his dominions, as well as their relations of intercourse with his own subjects, is pleased to grant to them the privilege of nominating, and having, special magistrates to act for them, as judges conservators in those ports and cities of his dominions, in which tribunals and courts of justice are or may hereafter be established. These judges shall try and decide all causes brought before them by British subjects, in the same manner as formerly, and their authority and determinations shall be respected; and the laws, decrees, and customs of Portugal, respecting the jurisdiction of the judge conservator are declared to be recognised and renewed in the present treaty. They shall be chosen by the plurality of British subjects residing in, or trading at, the port or place, where the jurisdiction of the judge conservator is to be established; and the choice so made shall be transmitted to his Britannic majesty's ambassador, or minister resident at the court of Portugal, to be by him laid before his royal highness the Prince Regent of Portugal, in order to obtain his royal highness's consent and confirmation, in case of not obtaining which, the parties are to proceed to a new election, until the royal approbation of the Prince Regent be obtained."—The residue of the article provides for the removal of the judge conservator by application through the ambassador or minister; and also contains some stipulations in return on the part of his Britannic majesty.)

might have been carried on by the neutral on his own account. The Vigilantia, 1 C. Rob. Adm. 1.

Prescott, on same side.

There are two commercial houses, Dyson Brothers and Co. in England, and Dyson Brothers and Finney in Rio, both being composed of the same partners. The property captured was on its way from the house in the enemy's country to that in the neutral country, and it is contended:

1. That the part belonging to the partners domiciled in the neutral country is not subject to confiscation. The laws of nations authorize the belligerent to abridge the rights of the neutral, so far only as may be necessary for his own protection. The law of contraband is governed entirely by this principle. In peace, the neutral has a right to carry on trade with another country, either by shipments and returns, or by establishing houses in the two countries consisting of the citizens of each. If this right may be taken away in war, it can only be because it is injurious to the belligerent. It is true, that by such commerce one of the belligerents may be enriched, but this circumstance alone cannot give the opposite party a right to interfere. To a certain degree the enemy is benefited by all commerce carried on with him by other nations; yet the commerce is not therefore illegal. It will not be denied, that the neutral may have an agent in the enemy's country, and however intimate the trade, it is not to be intercepted. Why then should the belligerent have a right to interfere, when there are two houses? What reason is there for saying to the neutral, "you may carry on a direct trade, and send your ships backwards and forwards, as much as you will, but you shall not have any association with merchants there?"

If the doctrine contended for on the part of the captors were well founded, it would be necessary, on the breaking out of war, to dissolve all partnerships existing between the citizens of either of the belligerent powers, and those of other countries. The neutral partners must abandon their commercial connexions and return home, and those remaining in the belligerent country must find new employment, distinct from that of their partners. There is no authority to countenance a doctrine so extensively mischievous. None of the cases alluded to will embrace the present. They are all cases of persons, who, having a commercial house in the hostile country, and being citizens of that country, abandon it after or shortly before the war, and continue to employ their capital in adventures, which terminate in the enemy's country, where the house is still kept up. In most of the cases under consideration, there is a house of trade in the neutral country, and a partner resident in the enemy's country, and the enemy is not profited by the trade more than the neutral. The case would not be different, if the neutral traded directly with the enemy's country,

without any partner there. It is true, that the national character may be affected by the traffic, as well as by the residence. Such is the case of the Dutch fishing vessel. The Vigilantia, 1 C. Rob. Adm. 11. But this is very different from the case of a house having one of its partners in a neutral country and the other in that of the enemy, and still more unlike the case of two houses of trade, one in each of the countries. In Ostermeyer's Case (The Portland, 3 C. Rob. Adm. 41), Sir W. Scott's difficulty arose from a suspicion that Ostermeyer had a sole house of trade in Ostend, and perhaps also, from his having been engaged with a partner in that place. That case is very far from supporting the principle contended for here. In Rudolf's Case (The Herman, 4 C. Rob. Adm. 230), the property appearing to be shipped on the account of Rudolf, who resided and carried on a separate business at Embden, the trade was considered legal, though he was at the same time a partner in a house in London, to which the property was shipped from the enemy's country.

STORY, Circuit Justice. How do you distinguish between the case, where a man has one house in the enemy's country, and another in a neutral country, in the latter of which he resides, and the case, where there are a hostile and a neutral house composed of two partners, one residing in each country?

Mr. Prescott. Sir W. Scott has not put the case of a person having a house in the neutral country. They are however distinguishable. When there is but one man, one house must be subsidiary to the other, and the belligerent would be defrauded by the neutral's covering the whole by means of his residence. But in the case of two partners, both may be principal houses, and in that case one half is liable to condemnation. The cases of the St. Eustatius house, and of the emigrants from Nantucket, cited 1 C. Rob. Adm. 14, are directly in point for the claimants.

2. It is contended, that the provisions of the 10th article of the treaty of 1810 have no effect to make this case an exception from the general rule as to national character. The general rule I have ever supposed to be, that all persons resident in the territory partake the character of the sovereign. Peace with him is peace with all, who are under his government. It cannot be conceived, that persons, living under the jurisdiction of the same sovereign, should have different rights as to foreign powers; that some should be at peace, while others are at war. The treaty does no more, than to revive certain commercial privileges, which had anciently subsisted between England and Portugal. The judge conservator is always to be a native Portuguese; and in fact his tribunal differs not essentially from the consular courts. The authority of the judge emanates from the sovereign of Portugal, and that sovereign must enforce the judgment. There is no reason, why an English-

man should not be as much domiciled in Portugal, as a Jew in England. The rule, as to persons resident in factories, does not apply to this case. The rule itself has never been extended further than to factories established in the dominions of the Asiatic powers. If the doctrine contended for were true, it would follow, that if we were at war with Portugal, and at peace with Great Britain. the property of British subjects resident in Portugal would be protected from capture. And, on the other hand, what would there now be to restrain an American cruiser from entering a Portuguese harbor and taking out British ships? Upon this principle, the territory would not be neutral. There would be at best a divided empire, and we should be at this moment at war with many of the subjects of Portugal.

Mr. Dexter, in reply.

The question is simply as to the commercial character of the claimants. It is personal, and does not relate to the branch of trade they are engaged in. And though it is necessary to consider this question in two points of view, viz. how far the commercial character is affected by the trade, and how far by the treaty, still these must be put together, to determine the national character.

1. Though it be true, that a neutral may carry on commerce, in time of war, with our enemy's country, yet he cannot carry it on in that country. In The Vigilantia, 1 C. Rob. Adm. 14, two cases are cited, in which the part belonging to a partner resident in a neutral country was restored. Sir W. Scott says, that from these it had been supposed, that the character was determined from residence alone. but it was otherwise ruled in a case before the lords of appeal, and held, that such restitution was confined to cases happening at the commencement of a war. The principle established by the case of the Vigilantia is, that trade, carried on in a belligerent country by one resident in a neutral country, is subject to confiscation, if he does not withdraw his trade after reasonable notice of the war. How is trade to be carried on then, he being absent? The strongest case, perhaps, is that of a house of trade in the belligerent country, in which a neutral is a partner. But the principle extends yet further, and embraces a case where there is no house established in the enemy's country, but the trade is carried on by an agent residing there. What is done by the partner or agent is done by the neutral himself. It is by no means necessary, that a man should have a counting-house in any place. in order to make him a merchant of that place. Jonge Klassina, 5 C. Rob. Adm. 297. The Case of Ostermeyer also confirms this view of the prize law. It was thought, that if he was still a secret partner in the house in Ostend. or if, though a neutral, he was carrying on trade by an agent in Ostend, he was, as to such trade, an enemy, and his property engaged in it was liable to capture. He is called upon for further proof, both as to sole and joint trade, and the infer-

ence is, that either of these would be sufficient to subject his property to confiscation. There can be no difference between a trade carried on from Great Britain to Rio Janeiro, and from Great Britain to France or any other country. The residence of the claimant in Rio can make no difference whatever, as to his rights in this respect. But how far is this to be considered, in reason, as a trade carried on to Rio? It is not denied, that if half of the owners are in England, and half in Rio, one half of the property is to be condemned. The remaining half cannot be considered as exclusively the trade of Rio. It is equally the trade of Great Britain, and there would be, as to this half, at least as much reason to condemn as to acquit. Here the distinction is to be attended to. The neutral has not engaged in trade with the enemy, but in the enemy's country. With regard to enterprises originating in Great Britain, he is, according to the decision in the Jonge Klassina, to be considered a British merchant, and with regard to those originating in Rio, as a Portuguese merchant. Now this voyage originates in Great Britain. The distinction is a reasonable one. The whole trade cannot be considered as neutral, and part being transacted in England, part in Rio, there is no better rule, than to adjudge that portion hostile, which originates in Great Britain, and the other neutral.

STORY, Circuit Justice. If there were nothing in the papers to show where the voyage began, is the property then to be considered hostile?

Mr. Dexter. It might depend on the fact, when and by whom it was purchased and laden.

2. Not only are the claimants resident in a neutral country. and carrying on trade in the enemy's country, but, in most of the cases, they are native subjects of Great Britain, residing in the Portuguese dominions, without intention of mixing with the people of that country, and permitted by treaty to remain there without such mixture. Is their domicil changed by a residence under such circumstances? There must be an animus manendi, to constitute domicil. This is Vattel's definition. The domicil is not changed, until the man not only resides in the country, but becomes a member of the civil community. The treaty between Great Britain and Portugal provides, that the subjects of the former resident in the dominions of the latter may choose a judge. It must be intended, that he should judge according to the English laws. Did the sovereign of Portugal mean to admit, that his own courts were corrupt? This is hardly to be supposed. The only probable account of the article is, that the Portuguese courts not understanding the English laws, the Prince Regent was willing, that a court should be formed, in which the British should enjoy their own laws. They were thus separated and distinguished from his own subjects, as to all commercial purposes, and

therefore the principal reason is here wanting, which in ordinary cases makes the domicil and the national character to follow the residence. We have no reason to apprehend from this doctrine the extravagant effects, which have been attributed to it. A third nation would not be bound to acknowledge the British residents in Portugal, as retaining their British character. There would not therefore be the imperium in imperio supposed on the other side. Sir W. Scott has, in several instances, spoken of British subjects so situated, as continuing to be British. In The Indian Chief we have the reason given, why the residents in factories are still considered citizens of the country, to which the establishment may belong. It is, that they cannot mix with the natives. In the present case, the sovereigns of both countries have entered into an agreement, that their subjects shall not mix. This compact of the two sovereigns is certainly equivalent to the prohibition of one. The case is analogous to that of the establishments in the East Indies.

Argument upon the questions of proprietary interest:

In several of the claims, the manner of the shipment gave rise to questions, as to the proprietary interest at the time of the capture. Before introducing the argument, it will be necessary to state briefly the circumstances of the two principal claims.

Claim of J. Lizaur—In this case the bill of lading expressed the property to be shipped by Dyson Brothers and Co., consigned to Dyson Brothers and Finney, but contained no account and risk. The invoice declared the goods to be consigned to Dyson Brothers and Finney, "by order and for account of J. Lizaur." From a letter it appeared, that the purchase was made by order of the claimant, and exceeded the amount of funds in the shippers' hands; that they debited him the amount of the invoice, including freight, commissions, &c. at six months' credit; and the consignees are directed to do as they think proper.

Claim of J. M. Pinto.—The bill of lading and invoice were similar to the last. A letter informed Dysons and Finney, that they were debited the amount of the goods ordered by them for Pinto, and enclosed a bill of exchange for the same sum on Pinto to order of Dysons and Finney, "which they would use or not, as they pleased."

Pitman, for captors.—The property had not vested in the claimants. When the delivery depends upon a condition to be performed, the property of the shipper is not devested until performance of the condition. The Constantia, 6 C. Rob. Adm. 327.

Mr. Sullivan, for claimants, cited as to change of property, 1 C. Rob. Adm. 336; 4 C. Rob. Adm. 113, note; 2 Com. Cont. 210, where the cases on the subject of sales are collected.

STORY, Circuit Justice, stated briefly the facts and points adjudged in several cases, which had recently been determined in the supreme court of the United States, viz. The Frances (French's claim) 8 Cranch [12 U. S.] 359; the claim of W. and J. Wilkins; and the claim of Kimmell and Albert.[4]

Prescott, for claimants.

The cases of Lizaur and Pinto very much resemble that of Wilkins, decided in the supreme court, in favor of the claimant. Here was an order from Lizaur to purchase and ship merchandise for his account, and he made a remittance in payment. The order, it is true, exceeded the amount of funds, but there was an agreement on Lizaur's part to purchase the goods, and that the funds should be applied towards the payment. Dyson Brothers and Co. accordingly purchased and shipped on account of Lizaur. The goods were at his risk from that time, and indeed from the time of the purchase, if the purchase for his use could be proved. Had the warehouse of the shippers, after such purchase, been consumed by fire, the loss of the goods would have been Lizaur's. The difficulty arises from the manner of the consignment. The goods are shipped to Dyson Brothers and Finney, in order to give a right of stoppage in transitu, or at least to preserve the shipper's lien on the goods. There was a right to retain until the money was paid. Lizaur, after tendering the price, might have recovered the goods, and Dyson Brothers and Co. might have brought an action for the money and recovered it of Lizaur. As the goods had been purchased by his order, he could not have defended himself upon the ground that the goods had not been delivered. A general rule for ascertaining whether the property has vested, is to ascertain whether any thing remains to be done by the vendor. If a bargain be made, and before delivery the thing is destroyed, it is settled, that if nothing further was to be done by the vendor, the buyer must sustain the loss. Rugg v. Minett 11 East, 210. The same doctrine is to be found in Pothier. Pinto's case is even stronger than Lizaur's. The goods were purchased in compliance with an order given to the house in Rio. They were shipped for account and risk of Pinto, and a bill of exchange drawn on him for their value. They were sent to the house in Rio, that they might deliver them to Pinto, and procure his acceptance of the bill.

Dexter, in reply.

The questions before the court are not now to be settled by the authority of English books. They have received a direct determination in our own supreme court. The broadest principle established in favor of the neutral is, that the property shall vest, when it appears to have been delivered to the captain as his agent, being shipped in pursuance of orders, or when, instead of an absolute consignment, such papers are sent to the claimant, as will enable him to obtain possession of the property. The cases of Lizaur

[4] These cases do not appear to have been reported.

and Pinto differ, but in neither of them is there a delivery to the claimant or his agent. On the contrary, they are to be delivered to the shippers themselves. In the case of Pinto, there was to be no sale, unless the house should be satisfied of his credit.

STORY, Circuit Justice. This is a case of a Portuguese ship with a very valuable cargo on board, bound on a voyage from Liverpool to Rio de Janeiro in the Brazils, and captured on the 16th day of May last, by the private armed ship Yankee, and carried into Portland, in the district of Maine, for adjudication. Various claims were interposed by the master for himself and others, as owners of the ship or of some portions of the cargo, in the district court of Maine, and from the sentence of that court an appeal has been taken to this court. It will be necessary to give these several claims a distinct consideration.

Claim of Costa, Guimaraens and Co. for the ship: The ship is claimed by the master, as the property of the house of Messrs. Costa, Guimaraens, and Co. of Liverpool. The claim alleges, that the house consists of four persons, viz. Antonio Julico Da Costa and Manuel Rilairo Guimaraens, who are Portuguese subjects domiciled in England, and Carlos Lucena Mendes and Joao Gaudentio Da Costa, who are Portuguese subjects domiciled at Maranham in Brazil. The master, in his answer to the standing interrogatories, declares the owners to be Messrs. Da Costa and Guimaraens, who, he alleges, are partners in trade, and produces a copy of a bill of sale, by which the legal property of the ship is vested in Guimaraens alone. It is unnecessary to consider the effect of this contrariety between the answer of the master and the asserted claim, though for myself, I am free to declare, that it will be extremely difficult to maintain that his regular answers can ever be outweighed by any subsequent declarations, after the pressure of the case is fully known, and counsel has been taken. It is clear, that the legal title of the ship can be asserted in the prize court, as to those persons only to whom a bill of sale regularly conveys it. Whatever equitable interests may exist in other persons is immaterial; the court looks singly to the bill of sale, as a document, which is recognised by the law of nations, and the ownership must be decided by it. It is, as Sir William Scott observes, the universal instrument of transfer of ships in the usage of all maritime countries, and in no degree a peculiar title deed or conveyance, known only to the law of England. The Sisters, 5 C. Rob. Adm. 155. The ownership therefore in this case must be deemed to be in Mr. Guimaraens, and, as he is domiciled in the enemy's country, it must be condemned as enemy's property. The Vigilantia, 1 C. Rob. Adm. 1 (1 Kent, Comm. 78, 79).

The next claim is that of Messrs. Dyson Brothers and Finney, of Rio de Janeiro. The goods in this claim were shipped by Messrs. Dyson Brothers and Co. of Liverpool, by order, for account of, and consigned to Messrs. Dyson Brothers and Finney, of Rio de Janeiro. From the letters and accompanying documents it appears, that the houses at Rio and at Liverpool are composed of the same persons, who are all native subjects of Great Britain, viz. James Finney domiciled at Rio, Thomas F. Dyson, at Liverpool, and —— Dyson, at Halifax, in England.

Upon these facts, respecting which there is no controversy, the captors claim condemnation of two thirds of the shipment, as the property of British subjects domiciled in England, and, as to this property, there is no doubt that condemnation must follow. As to the other third, which constitutes the share of James Finney, the captors contend, that it is liable to condemnation on two grounds:—1st. As the property of a person connected in a house of trade in the enemy's country, and continuing that connexion after and during the war, the property having been purchased and shipped on the account and risk of the same house. 2d. Because under the Portuguese treaty of 1810 with Great Britain, British subjects domiciled in the dominions of Portugal are deemed, for commercial purposes, as retaining their British, and consequently, in the present case, their hostile, character. As each of these questions is applicable to several of the claims before the court, I will give each of them a distinct examination.

And as to the first point, it is very clear that, in general, the national character of a person is to be decided by that of his domicil; if that be neutral, he acquires the neutral character; if otherwise, he is affected with the enemy's character. But the property of a person may acquire a hostile character, altogether independent of his own peculiar character derived from residence. In other words, the origin of the property, or the traffic, in which it is engaged, may stamp it with a hostile taint, although the owner may happen to be a neutral domiciled in a neutral country. Such are the familiar instances of engagements in the colonial, coasting, fishing, or other privileged trade of the enemy. The Vigilantia, 1 C. Rob. Adm. 1; The Susa, 2 C. Rob. Adm. 251; The Princessa, Id. 49; The Anna Catharina, 4 C. Rob. Adm. 107; The Rendsborg, Id. 121; Berens v. Rucker, 1 W. Bl. 313; The Immanuel, 2 C. Rob. Adm. 186, 4 C. Rob. Adm. Append. A.; The Maria, 5 C. Rob. Adm. 365; The Vrow Anna Catharina, Id. 161; The Vriendschap, 4 C. Rob. Adm. 166. So the produce of an estate belonging to a neutral, in an enemy's colony, is impressed with the character of the soil notwithstanding a neutral residence. The Phœnix, 5 C. Rob. Adm. 20; The Dree Gebroeders, 4 C. Rob. Adm. 232. So if a vessel, purchased in the enemy's country, is by consent and habitual occupation, continually employed in the trade of that country during

the war, she is deemed a vessel of the country from which she is so navigating, whatever may be the domicil of the owner. The Vigilantia, 1 C. Rob. Adm. 1; The Jonge Emilia, in The Portland, 3 C. Rob. Adm. 41–52. The principle to be extracted from these cases seems to be, that where a person is engaged in the ordinary or extraordinary commerce of an enemy's country upon the same footing and with the same advantages, as native resident subjects, his property, so employed, is to be deemed incorporated into the general commerce of that country, and subject to confiscation, be his residence where it may. And the principle seems founded in reason. Such a trade, so carried on, has a direct and immediate effect in aiding the resources and revenue of the enemy, and in warding off the pressure of the war. It is not distinguishable from the ordinary trade of his native subjects. It subserves his manufactures and industry; and its whole profits accumulate and circulate in his dominions, and become regular objects of taxation, in the same manner as if the trade were pursued by native subjects. There is no reason, therefore, why he, who thus enjoys the protection and benefits of the enemy's country, should not, in reference to such a trade, share its dangers and its losses. It would be too much to hold him entitled, by a mere neutral residence, to carry on a substantially hostile commerce, and, at the same time, possess all the advantages of a neutral character. I agree, therefore, "that it is a doctrine, supported by strong principles of equity and propriety, that there is a traffic, which stamps a national character on the individual, independent of that character, which mere personal residence may give him." And I think the case now before the court comes clearly within the range of the principle which I have already stated. Here is a house of trade, composed entirely of British subjects, established in the enemy's country, and habitually and continually carrying on its trade, with all the advantages and protection of British subjects. It is true one partner is domiciled in the neutral country; but for what purposes? For aught that appears, for purposes exclusively connected with the Liverpool establishment. At all events, the whole property embarked in its commercial enterprises centres in that house, and receives its exclusive management and direction from it. Under such circumstances, the house is as purely British in its domicil (if I may use the expression) and in its commerce, as it could be, if all the partners resided in the British empire. If the case, therefore, were new, I do not at present perceive, how it could be extracted from the grasp of confiscation, from its thorough incorporation into the enemy's character.

But, how stands the case upon the footing of authority? It is argued, that no decision comes up to the point, and that the court is called upon, by the captors, to promulgate a novel doctrine. If, however, I am not greatly deceived, it will be found, on an attentive examination, that there is a strong current of authority all setting one way. From the cases of The Jacobus Johannes and The Osprey, 1 C. Rob. Adm. 14, note, an erroneous notion had been adopted, that the domicil of the parties was that alone, to which the court had a right to resort in prize causes. But, in the case of Coopman (The Nancy, 1 C. Rob. Adm. 14, 15, note), those cases were put upon their true foundation, as cases merely at the commencement of a war, in reference to persons, who, during peace, had habitually carried on trade in the enemy's country, though not resident there, and, therefore, entitled to have time to withdraw from that commerce. But the lords of appeal, in that case, expressly laid it down, that if a person entered into a house of trade in the enemy's country in time of war, or continued that connexion during the war, he should not protect himself by mere residence in a neutral country. Now, I am utterly at a loss to know, how terms more appropriate could be employed to embrace the present case, which is that of a connexion in a house of trade in the enemy's country, continued during the war. This doctrine, held by the highest authority known in the prize law, has been repeatedly recognized and enforced by the same learned court. Vide, in The Susa, 2 C. Rob. Adm. 255; The Indiana, 3 C. Rob. Adm. 44, note. In the cases of The Portland (3 C. Rob. Adm. 41), &c. the very exception was taken, as to Mr. Ostermeyer, who, though domiciled at Blankanese, was alleged to be engaged in the trade of Ostend, either as a partner, or as a sole trader. In those cases the general principle was explicitly admitted, and one vessel (the Jonge Emilia) eventually condemned on that ground. It is a mistake of the learned counsel for the claimant, that the court, in those cases, confined the further proof to the fact, whether Mr. Ostermeyer was a sole trader at Ostend; it will appear on a careful examination, that further proof was also required as to the alleged partnership, and particularly as to a letter in the Frau Louisa, pointing to that partnership. In The Jonge Klassina, 5 C. Rob. Adm. 302, which was a very strong case of its rigid application, Sir W. Scott avows the same doctrine, and declares, that a man may have commercial concerns in two countries; and if he acts as a merchant of both, he must be liable to be considered as a subject of both, with regard to the transactions originating respectively in those countries. The case of The Herman, 4 C. Rob. Adm. 228, so far from impugning the principle, evidently proceeds upon the admission of it; and I think it may be affirmed without rashness, that not a single authoritative dictum exists, which can shake its force. It has been attempted to distinguish those cases from that before the court, by alleging, that none of them present the fact of a shipment made from a house in the enemy's country to its connected house in the neutral coun-

try. But, it does not seem to me, that this difference presents any solid ground, on which to rest a favorable distinction. On the whole, I am of opinion, that the shipment, in this case, being made by a house in the enemy's country, for their own account, in a voyage originating in that country, must be deemed enemy's property, and that the share of Mr. Finney must follow the fate of the shares of his partners.

The captors have further contended, in reference to other claims before the court, that the same principle applies in cases, where a house, in the enemy's country, ships goods to one of its partners domiciled in a neutral country, either in his single name, or to a neutral house there, of which he is also a partner; and é converso, where a partner of a neutral house is domiciled in the enemy's country, and ships to such house goods the manufactures of that country. In respect to the two former cases, I agree at once to the position, if the shipment be really made on the account, and for the benefit of the house in the enemy's country. For, in such case, the neutral partner, or house, acts but as their agent, and the whole property and profits of every enterprise rest in the hostile house. And, indeed, it is wholly immaterial, under such circumstances, to whom the consignment may be, whether to a partner or a stranger. The property, in its origin, transit and return, is thoroughly imbued with the enemy's character. And the same may be affirmed of the third case, if the partner, so domiciled in the enemy's country, be really engaged in the general commerce of that country, for the exclusive benefit of his neutral house. For although, in general, in the residence of a stationed agent in the enemy's country will not affect the trade of the neutral principal with a hostile character, yet this is true only as to the ordinary trade of a neutral as such, carried on in the ordinary manner. But where such trade is carried on, not on the footing of a foreign merchant, but as a privileged trader, or by an incorporation with the general commerce of the enemy in the same manner, and with the same benefits, as a native merchant, it would seem to be embraced in the general doctrine, which I have already stated. Vide The Anna Catharina, 4 C. Rob. Adm. 107–119; The Rendsborg, Id. 121–139; The Indiana, 3 C. Rob. Adm. 44, note.

But the principles contended for by the captors, as I understand the argument, spread over a wider surface, and extend to cases, where a shipment has originated in a house in the enemy's country, of which such partner is a member, although the shipment be bona fide, and exclusively on account and risk of such neutral partner or house. And the declaration of Sir William Scott in The Jonge Klassina, 5 C. Rob. Adm. 297–302, which I have already quoted, is relied on as an authority, which supports the argument. But I do not think, that the language of Sir

William Scott, correctly considered, admits of this interpretation. He is merely alluding to the origin of transactions, which exclusively regard the interests of a house of trade established in a particular country, and not transactions, where it acts merely as an agent, or shipper, for other persons. To show this more distinctly, the learned judge in The Portland, 3 C. Rob. Adm. 41–44, says: "I know of no case, nor of any principle, that could support such a position as this, that a man having a house of trade in the enemy's country, as well as in a neutral country, shall be considered in the whole concerns as an enemy's merchant, as well in those solely, which respect his neutral house, as those, which belonged to his belligerent domicil. The only light, in which it could affect him, would be as furnishing a suggestion, that the partners in the house in one place were also partners in the other." And in The Herman, 4 C. Rob. Adm. 228, where a shipment was actually made from an enemy's port, by order of the neutral house to the belligerent house, but on account of the former, the property was adjudged to be restored. These cases do, as I think, assign and establish the true and reasonable limits of the doctrine; and I have no difficulty in affirming, that shipments made by an enemy's house, on account and risk, bona fide and exclusively, of a neutral partner or house, are not subject to confiscation as prize of war. And the same principle must apply in the converse case of a partner or agent, domiciled in the enemy's country, and making shipments to his neutral house, or principal, on the exclusive account of the latter.

I now come to the consideration of the effect of the Portuguese treaty as to British subjects domiciled in the Portuguese dominions; a question which, though it may well be spared, as to the claims of Messrs. Dyson Brothers and Co., rides over a large mass of claims, and must eventually decide them. The articles relied on by the captors are the 8th and 10th. The former in substance provides, that British subjects within the Portuguese dominions shall not be restrained by any monopoly, contract, or exclusive privileges of sale or purchase (saving only those of the crown); but shall have free permission to buy and sell without being obliged to give any preference or favor in consequence of such monopolies, &c. The latter grants to such British subjects the privilege of nominating, subject to the approbation and ratification of the crown of Portugal, judges conservators, who are to try and decide all causes brought before them by British subjects in the same manner as formerly; and the laws, decrees and customs of Portugal respecting the jurisdiction of such judges are declared to be recognized and renewed by the same treaty.

It is contended by the captors, that the privileges granted by these articles completely revive the exclusive British charac-

ter in British subjects within the dominions of Portugal; and the case is likened to that of the factories in the Eastern world, in which the residents have been universally held to take the national character of the establishment itself, under whose protection they carry on their trade. The Indian Chief, 3 C. Rob. Adm. 22, and the cases there cited. It is to be recollected, however, that this is a rule of the law of nations applying peculiarly to those countries, and different from what ordinarily prevails in Europe and the western parts of the world; and is founded on the immiscible character kept up from the earliest times in the East, where foreigners are never incorporated into the general society of the natives. It is indeed asserted by Sir W. Scott (The Henrick and Maria, 4 C. Rob. Adm. 43, 61) that the subjects of Great Britain, resident in Portugal, are distinguished by special privileges (the same in effect as secured by the present treaty); that they retain the British character in spite of the Portuguese domicil, even in the estimation of the enemy himself (i. e. France); and that they exercise an active jurisdiction at least over their own countrymen established in those parts. And in The Flad Oyen, 1 C. Rob. Adm. 135, 142, he alludes in the same manner to these extraordinary privileges. This language is exceedingly strong, and, though introduced in a collateral discussion, affords considerable countenance to the argument of the captors. Perhaps the same inclination of opinion may be traced in The Nayade, 4 C. Rob. Adm. 251. But whatever may be the bearing of this opinion, it seems now settled by the lords of appeal, that a British born subject, resident in the English factory at Lisbon, so far possesses the Portuguese character, as that his trade with the enemies of his native country is not illegal (The Danous, 1802, 4 C. Rob. Adm. 255, note); and from thence I infer, that he must be deemed, as to purposes of trade, as taking the general character of his domicil. Upon the footing of authority therefore, the case for the captors is not made out. And upon principle, I think it is as difficult to maintain. The 8th and 10th articles of the treaty secure no more, than the freedom of trade, and the right to have all causes tried by a special tribunal according to the laws and customs of Portugal. Still, however, it is an incorporation of British residents into the general commerce of the country. They are still subject to the general laws respecting revenue and taxes; to the general duties of qualified allegiance; and to the general regulations of social and domestic, as well as commercial, intercourse. Far different is this from the case of Eastern factories, where the laws of the factory govern the parties, who claim protection under it, and no general amenability to the laws of the country is either claimed or exercised. Without going more at large into this topic,

I am satisfied, that British residents in the dominions of Portugal take the character of their domicil, and as to all third parties, are to be deemed Portuguese subjects.

The next is the claim of Mr. J. Lizaur of —— in Brazil. The shipment was made by Messrs. Dyson Brothers and Co., and by the bill of lading the goods are consigned to Messrs. Dyson Brothers and Finney, Rio de Janeiro. The accompanying invoices express the shipment to be made by order and for account of Mr. J. Lizaur, and contain charges of freight, commission and insurance, and an acknowledgment of giving credit for three and six months. In a letter of the 4th of May, 1814, addressed by the shippers to the consignees, they say "for Mr. Lizaur we open an account in our books here, and debit him £2450. 2s. 3d. amount of 14 bales, at six months credit, and £1764. 11s. 7d. for 16 cases of cambrics, &c. at three months' credit; we cannot yet ascertain proceeds of his hides, &c. but find his order will far exceed amount of these shipments, therefore consign the whole to you, so as you may come to a proper understanding. We have charged our usual commission of two and a half per cent. in the invoices, but should you have made any stipulation to the contrary, he can again bring same to our debit. Invoices, bills of lading, and patterns of what goods are requisite, we forward as usual in a small box to your address."

The single question presented in this claim is, in whom the property vested during its transit; if in Mr. Lizaur, then it is to be restored; if in the shippers, then it is to be condemned. It is contended on behalf of the claimant, that the goods, having been purchased by order of Mr. Lizaur, the property vested in him immediately by the purchase, and the contract being executed by the sale, no delivery was necessary to perfect the legal title; that nothing was reserved to the shippers, but a mere right of stoppage in transitu, and that if they had been burnt before the shipment, or lost during the voyage, the loss must have fallen on Mr. Lizaur.

As to the doctrine of stoppage in transitu, I do not conceive it can apply to this case. That right exists in the single case of insolvency, and presupposes, not only that the property in the goods has passed to the consignee, but that the possession is in a third person in their transit to the consignee. It cannot therefore touch a case, where the actual or constructive possession still remains in the shipper or his exclusive agents. Abb. Shipp. pt. iii, c. 9, p. 402.

I agree also to the position, that in general the rules of the prize court, as to the vesting of property, are the same as those of the common law, by which the thing sold, after the completion of the contract, is properly at the risk of the purchaser. Feise v. Wray, 3 East, 93; Rugg v. Minett, 11 East, 210; Hanson v. Meyer, 6 East, 614;

The Constantia, 6 C. Rob. Adm. 321; Kinloch v. Craig, 3 Term R. 119, 783. But the question still recurs, when is the contract executed? It is certainly competent for an agent abroad, who purchases in pursuance of orders, to vest the property, immediately on the purchase, in his principal. This is the case, when he purchases on the credit of his principal, or makes an absolute appropriation and designation of the property for his principal. But where a merchant abroad, in pursuance of orders, sells either his own goods, or purchases goods on his own credit, (and thereby in reality becomes the owner) no property in the goods vests in his correspondent, until he has done some notorious act to divest himself of his title, or has parted with the possession by an actual and unconditional delivery for the use of such correspondent. Until that time he has in legal contemplation the exclusive property, as well as possession; and it is not a wrongful act for him to convert them to any use, which he pleases. He is at liberty to contract upon any new engagements, or substitute any new conditions, in relation to the shipment. And this I understand not only as the general law, but as the prize law pronounced by that high tribunal, whose decision I am bound to obey. In The Venus (at February term, 1814) 8 Cranch [12 U. S.] 253, on the claim of Magee and Jones, in delivering the opinion of the court, Mr. Justice Washington observed: "To effect a change of property, as between seller and buyer, it is essential, that there should be a contract of sale agreed to by both parties, and if the thing agreed to be purchased is to be sent by the vendor to the vendee, it is necessary to the perfection of the contract, that it should be delivered to the purchaser or to his agent, which the master (of a ship) to many purposes is considered to be." And adverting to the facts of that claim he further says: "The delivery of the goods to the master of the vessel was not for the use of Magee and Jones, any more than it was for the shipper solely, and consequently it amounted to nothing, so as to devest the property out of the shipper, until Magee should elect to take them on joint account, or to act as the agent of Jones."

In the present claim before the court, the delivery to the master was not for the use of Mr. J. Lizaur, but for the consignees, who are in fact the shippers. They, therefore, retained the constructive possession as well as right of property; and it is apparent from the letter, that the shippers meant to reserve to themselves, and to their agents in relation to the shipment, all those powers, which ownership gives over property. It is material also, in this view, that all the papers respecting the shipment were addressed to their own house, and the claimant could have no knowledge or control of the shipment, unless by the consent of the consignees under future arrangements to be dictated by them. In this view, I cannot distinguish the case from that of Messrs. Kimmell and Albert's claim in the Merrimack [8 Cranch (12 U. S.) 316], at February term, 1814; and it steers wide of the distinction, upon which Messrs. Wilkins' claim in the same ship, at the same term, was sustained. The authorities also cited at the argument by the captors are exceedingly strong to the same effect. The Aurora, 4 C. Rob. Adm. 218, approaches very near to the present case. There the shipment, by the express agreement of the parties, was in reality going for the use and by the order of the purchaser, but consigned to other persons, who were to deliver them, if they were satisfied for the payment. And Sir W. Scott there quotes a case, as having been lately decided, where goods sent by a merchant in Holland to A., a person in America, by order of B. and for account of B. with directions not to deliver them unless satisfaction should be given for the payment, were condemned as the property of the Dutch shipper. On the whole, I am of opinion, that the goods included in this shipment were, during their transit, the property of and at the risk of the shippers, and therefore subject to condemnation. The claim of Mr. Lizaur must therefore be rejected.

In this connexion, it may be well to dispose of the claim of Joaquim Martins Pinto, of Rio de Janeiro. The shipment is made and the papers enclosed by Messrs. Dyson Brothers & Co. to their house at Rio de Janeiro, as in the former case. In the bill of lading no account or risk is stated, but the invoice is headed, shipped, &c. by order of and consigned to Messrs. Dyson Brothers and Finney for account and risk of Joaquim Martins Pinto. In a letter of the 4th of May, 1814, the shippers write to the consignees: "You are debited £233. 19s. 4d. for a case of stocking web ordered for Joaquim Martins Pinto; for the same sum we enclose first our draft on Mr. Pinto at 30 days sight to your order at the exchange of eighty-two and a half per mil rea, which you can either make use of, or not, as you think proper." I do not think this can, in point of law, be favorably distinguished from the preceding case. Mr. Pinto is not, but the consignees are, debited with the amount. Had the shipment under these circumstances been to a third person, he must have been deemed the vendee, having the constructive possession and property of the goods and entitled to give any new direction to them. As the shippers and consignees are here the same persons, the language used shows, that it was not intended to vest any property in Pinto; but to leave the delivery and disposition of them to the house in Rio. The claim of Mr. Pinto must therefore be rejected.

The next is the claim of Messrs. Antonio Roiz Dos Santos & Co. of Rio de Janeiro. The proof of property in the claimants hardly admits of a doubt. But as further proof will be necessary, as to who compose the house

of Santos & Co. and of the domicil of the partners, it may be well also to furnish the court with proof of the orders sent to Messrs. Dyson Brothers respecting the shipments made by them.

The next is the claim of Messrs. Heyworth Brothers & Co. of Rio de Janeiro. The shipment is made by the house of Ormerod Heyworth & Co. of Liverpool, which, upon a careful examination of the letters, appears to be composed of the same persons as the house at Rio, viz. Ormerod Heyworth and James Heyworth of Liverpool, and Lawrence Heyworth at Rio de Janeiro, and is upon the account and risk of the Rio house. The case therefore falls directly within the decision on the claim of Dyson Brothers and Finney. And this claim must be rejected.

The next is the claim of Messrs. Turner, Naylor & Co. of Rio de Janeiro, which firm consists of John Turner and George Naylor of that place, and John Todd Naylor of Wakefield in England. The claim includes six distinct shipments. The first is shipped by George Green of Liverpool to Turner, Naylor & Co. and the invoice and bill of lading express only a consignment to them. By a letter of the 4th of May, 1814, addressed by Messrs. Nathaniel and Falk. Phillips & Co. to the house at Rio, dated at Manchester, it appears that this shipment is made on the joint account of both houses. The moiety of Messrs. Phillips and the sixth part of Mr. John Todd Naylor must be condemned. And the two sixths of Messrs. John Turner and George Naylor, upon principles which I have already discussed, must be restored. The second is shipped by George Turner and Naylor of Liverpool to the house at Rio, and in the invoice is stated to be sent by the order, and for the account and risk of the latter, by John and Jeremiah Naylor & Co. of Wakefield. As to a part of the bale No. 14 included in this shipment, it does not appear from the papers to have been shipped by order of the consignees. In the letter of the 30th of April, 1814, of Messrs. J. and J. Naylor of Wakefield, to the house at Rio, they say "Please note the end of fine merino packed in bale No. 14 is quite a new article, which J. T. Naylor thinks will take in your market, of which pray advise us. Should it not, and there be any loss, debit us with it." And John Todd Naylor in a postscript of a letter of the 30th of April, 1814, addressed to George Naylor at Rio says: "There is a piece of stocking stuff of a new manufacture sent out by the house in one of the bales; I think it is an article likely to answer; pray give me your sentiments upon it as soon as possible; if it answers, it can be for our account; if you think it won't answer, sell it for account of J. and J. N. & Co. It is almost as fine as silk net." It is clear therefore that this must be deemed the property of the house at Wakefield, and of course be condemned. As to all the other packages, including No. 705 in a separate invoice, I must consider them as falling under the class of goods ordered by the consignees; and if bona fide the property of the consignees, two thirds must be restored. But there appears from the letters in the case such an intimate relation both in blood and business, between the house at Wakefield, and the house at Rio, that I think myself called upon to require further proof, as to the general connexion in business between these houses, and the terms and manner and circumstances, under which these and other shipments have been made. One third part of the property is at all events liable to condemnation. The third shipment is by George Turner and Naylor of Liverpool to the house in Rio of 40 barrels of shot on joint account of the two houses, and of 109 firkins of butter on joint account of the same houses and J. Todd Naylor, one third each. Of the first parcel two thirds, and of the last parcel seven ninths, are to be condemned, the residue to be restored. The fourth shipment is made by George Turner and Naylor to the house at Rio and by a bill of parcels and letter in the case the goods appear to have been purchased of Holgate Massey & Co. at Burley, and debited by them to the house at Rio. There is no question therefore as to the property—one third must be condemned and two thirds restored. The same may be observed of the fifth shipment bought of Leonard Slater, and of the sixth and last, consisting of two bales of blankets.

The next is the claim of P. F. Archango Dos Querubens, procurator general of the religious order of St. Antonio. This shipment is included in a bill of lading from George Turner & Naylor to the house of Turner, Naylor & Co. at Rio Janeiro. The invoice is of two bales sent for by order of Messrs. T. N. & Co. to be delivered at the custom house of Rio de Janeiro to the R. P. F. Archango Dos Querubens, procurator, &c. &c. or to whom may be acting for him, and signed by J. and J. Naylor & Co. In a letter of the 30th of April, 1814. in which the invoice and bill of lading were inclosed. J. and J. Naylor & Co. write to the house of Turner, Naylor & Co. at Rio: "We have taken due note of the contents of your letters, but the request of the friars of St. Antonio to have their clothes exactly similar to those sent per Roscius, &c. arrived too late, the bales being on their way to Liverpool, when we received your letter; the directions we before received from you were not to exceed the former price. Inclosed you have their invoices for sixteen bales, and shipped per the San Jose Indiano for your account and risk, viz. two bales St. Antonio, No. 4 and 5, amount, £338. 0s. 7d. to be remitted for on arrival," &c. It appears also, that insurance is charged on these goods at £3. 3s. the same as the other goods confessedly belonging to the house at Rio. Under all the circumstances of this claim, the strong inclination of my mind is, that the goods in their transit were not at the risk of the friars of St. Antonio. As, however,

further proof is not strenuously opposed. I shall allow it to be given, reserving any absolute opinion till it shall come in.

The next is the claim of March Brothers & Co. of Rio de Janeiro, which firm consists of William March of Liverpool, and Thomas March and George March of Rio de Janeiro. No question exists in relation to the two shipments included in this claim, which were purchased of Mr. Joseph Shore, and Messrs. Brittain, Wilkinson and Brownell. The title to this property is clearly in the firm; therefore, two thirds are to be restored and one third condemned. There are two other shipments made by Smith and Massey, one consigned to William March & Co. and the other to March Brothers & Co.; and in respect to these shipments there are no papers, except two bills of lading, which express no account or risk and are enclosed in blank letters, viz. that to W. March & Co. enclosed to March Brothers & Co. and that to the latter enclosed to the former. Notwithstanding this apparent contrariety, it is probable that both houses are in reality the same. But in my judgment this inquiry is not material. I hold it to be clear law, that in a time of war parties are bound to put on board such papers as shall evince the neutrality of the property, if it be entitled to that character; and where shipments are made from an enemy's country in an enemy's vessel, the presumption is, that every shipment belongs to enemies, on which a neutral character is not distinctly impressed. I condemn, therefore, these two last shipments to the captors.

The next is the claim of Seaton, Plowes & Co. of Rio de Janeiro. John F. Seaton of London, and John Plowes of Rio, are two of the partners of the house. It does not appear, who are the other partners, and as to the property, there is no question but that it belongs to the house. The general presumption of law is, where nothing to the contrary appears, that in a case like the present there are at least three partners; and, as to captors, the partners are deemed to take in equal moieties, unless on the face of the original papers a different apportionment appears. And the reason of the rule is manifest, for were it otherwise, as the evidence to change the proportions must come from the enemy, whose interest it must be to diminish his own share as much as possible, the court would, by admitting further proof, be exposed to every species of belligerent fraud. In the present case, if the captors do not ask that further proof may be admitted as to the other partners, I shall restore two thirds and condemn one third of the shipment.[5]

The next is the claim of William Harrison & Co. of Rio de Janeiro. There is no question as to the title of the property, and upon an examination of the papers, it appears that the house at Rio, at the time of this shipment (for at a previous time a Mr. Huntley seems to have been in the firm), consisted of William Harrison of Rio, and the house of A. and R. Harrison and Latham of Liverpool. The evidence is very clear, that A. and R. Harrison are domiciled in England, and there is not the slightest intimation that Latham is not there also. I shall restore William Harrison's one quarter part and condemn the residue.

The next is the claim of Francis and John Sommers. The shipment was made on joint account of Francis Sommers of Rio de Janeiro and the Rev. John Sommers, Mid Calder. The share of Francis Sommers must be restored. If Mid Calder be, as I presume it is, in the north of England, the other moiety must be condemned. As to this fact I will hear proof, if the parties wish.

The next is the claim of Miller and Flenning of Rio de Janeiro. The shipment is made on their account and risk, and appears to have been paid for out of funds of the claimants in the possession of the shippers. It is true, that the master has not in his answers sworn to the property of this shipment; and by the rigid rule of the prize law it might be deemed a case of further proof. The Juno, 2 C. Rob. Adm. 116, 122. But I cannot think so very plain a case will be urged to be within the range of the rule. I therefore restore the property.

The next claim which requires any particular examination, is that of the master for his own adventure. Claims of this sort, made by the master, are received with great indulgence by the court, when he appears to testify with fairness, and conducts himself with good faith. There are however, in the present case, after all the deductions, which even liberal explanations allow to a stranger speaking another language, some discrepancies and difficulties in the master's testimony, that none of his affidavits (even if they were all admissible), have been able satisfactorily to clear up. In his answers to the standing interrogatories, he has enumerated the various packages, which he claims as his sole property. In his claims he has included other packages, and particularly the whole invoice No. 4, amounting to £373. 16s. 10d. which in his answers to the standing interrogatories, he explicitly declared to be the property of Messrs. Da Costa, Guimaraens & Co. The goods also in invoice No. 1, amounting to £1159. 3s. 1d. and invoice No. 2, amounting to £1698. 13s. 5d. in his interrogatories, he swore were his sole property; in his claim, made after an examination of the papers, he swears, that one third part of the same invoices he purchased for one Francisco Gaudencio Da Costa of Maranham. This is not all, for it appears in the accounts of the shippers, Messrs. Da Costa, Guimaraens and Co., that the master is charged only with two thirds of these invoices—so that he could not be deemed the purchaser of the other third for Da Costa. The invoices of these two shipments (No. 1

---

[5] This claim was afterwards ordered to further proof as to the two thirds.

and 2) are expressed to be on account and risk of whom it may concern, to be delivered to J. J. Felis, and on the invoice (No. 1) these words are added, "Deliver to Sr. Felis 7 cases of silk stockings." In the bills of lading of the same invoices, the goods are to be delivered to the master; if absent, to Sr. Domingo Gomez Louveira and Sons. The same consignment is of invoice No. 4. If these shipments had been in reality for the account of the master, it is difficult to account for such an extraordinary consignment; if for the real, though concealed, account of Messrs. Costa, Guimaraens and Co., the letter from Mr. Costa to Mr. Louveira of the 5th of May, 1814, and the letter of Costa, Guimaraens and Co. of the same date, to Gomez Louveira and Sons, afford a key to the solution. It is also remarkable, that the invoices No. 3 and 5, which are charged in the account current as the master's property, and I have no doubt are so, are, by order of the master, deliverable to his order, or on account of the master. And the bill of lading of No. 3 (which is the only one found) is to the sole consignment of the master. These are some of the circumstances, which certainly throw a shade over the claim of the master; and it seems to me hardly to be expected, that a court should so far throw the mantle of charity over the case, as to decree a restoration of the whole property. I shall decree a condemnation of the goods in the invoice No. 4, being perfectly satisfied, that they do not belong to the master. The goods in the invoices No. 3 and 5 are to be restored. As to the goods in invoices No. 1 and 2, I fear that the order for further proof, which I shall allow, is under all the circumstances a relaxation of the prize law, which stands on the utmost limits of indulgence. I hope that it may not be drawn into precedent.

I give no opinion on the point, how far the master in this case is to be deemed to take the national character of the ship, in which he has sailed so many voyages from England. That point has not been argued, and upon the dry facts before me I have not felt it proper to touch that delicate subject. Vide The Embden, 1 C. Rob. Adm. 16.

As to the other claims in the case, I do not think it necessary to deliver any formal opinion. They are completely decided by the principles of law, which I have already stated, or depend on facts of the greatest simplicity.

[NOTE. On a question as to marshal's fees, it was held that the marshal was entitled to commissions upon prize property removed from his district, by consent of parties, to another district, and there sold. Case No. 12,323. For a final decree upon the master's claim, see Id. 12,324. This cause was taken to the supreme court, where the decree of this court was affirmed. 1 Wheat. (14 U. S.) 208.].